CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 20, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| **PPI/TIMEZERO, INC.,** | |
| *Plaintiff*, | |
| v. | |
| **ZENITH FIREARMS, INC.,** | Case No.: 3:24cv00037 |
| <u>Serve</u>: Gregory Johnson, Registered Agent<br>400 Locust Ave, Suite 1<br>Charlottesville, Virginia 22902 | |
| *Defendant*. | |

## <u>COMPLAINT</u>

1.  Plaintiff PPI/TimeZero, Inc. ("Plaintiff" or "PPI") brings this action against Zenith Firearms, Inc. ("Defendant" or "Zenith") seeking foreclosure on certain collateral and monetary and other relief arising out of Zenith's fraudulent inducement and subsequent breach of the August 4, 2023 Mutual Release and Settlement Agreement (the "Agreement").

### I.   Parties

2.  Plaintiff PPI/TimeZero, Inc. is a Delaware corporation with its principal place of business located in Fairfield, New Jersey.

3.  Defendant Zenith Firearms, Inc. is a Virginia corporation with its principal place of business located in Afton, Virginia.

### II.   Jurisdiction and Venue

4.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

5.  There is complete diversity between the parties.

29422\8000\11864362v1

6. The amount in controversy in this matter exceeds the sum or value of $75,000.00, exclusive of interest and costs.

7. This Court has personal jurisdiction over Zenith, as it has at least minimum contacts with the Commonwealth of Virginia.

8. Venue is proper in this judicial district under 28 U.S.C. § 1391 because, at all times material hereto, Zenith resides in this judicial district.

9. Section 5.12 of the Agreement provides that the exclusive jurisdiction for any dispute arising out of or in connection with the Agreement shall be brough in this Court.

### III.    Facts

*Background*

10. At all times relevant hereto, PPI provided highly-specialized contract-manufacturing services, including to companies in the military, law enforcement, aerospace, and medical industries.

11. In May 2021, PPI entered into a Manufacturing Services Agreement (the "MSA") with Zenith to manufacture Zenith's MP5-style firearms, magazines, and spare parts.

12. Over the following year, Zenith issued approximately seven (7) purchase orders pursuant to the MSA and directed PPI to manufacture over one hundred thousand firearms, including:

   a. Ten thousand (10,000) Z-5RS model 9mm semi-automatic pistols;

   b. Nearly 200,000 spare parts for the Z-5RS pistols;

   c. Ninety-six thousand (96,000) ZF-5 model 9mm semi-automatic pistols; and

   d. 18,950 magazines.

13. In total, Zenith's purchase orders totaled more than $100,000,000.00.

14. In reliance on these purchase orders, PPI secured materials, parts, and machinery from various suppliers, and it began to produce and deliver to Zenith the requested firearms.

15. Zenith, however, did not pay for the firearms that PPI manufactured and delivered. By mid-2022, Zenith owed PPI several million dollars for firearms that it manufactured and delivered pursuant to the MSA and purchase orders.

*The Settlement Agreement*

16. PPI and Zenith entered into settlement negotiations in an attempt to avoid the costs and expenses of litigation and address Zenith's breaches of the MSA. The Parties ultimately reached a deal whereby Zenith would purchase PPI's inventory of materials and machinery dedicated to the production of these firearms, which would allow Zenith to effectively bring the manufacturing of its firearms "in house."

17. This deal was memorialized in a Mutual Release and Settlement Agreement (the "Agreement") between PPI and Zenith, dated August 4, 2023.

18. Under Section 1.2(a) of the Agreement, Zenith agreed to pay PPI over $7 million as follows: (i) $300,000 on the Effective Date of the Agreement (*i.e.*, August 4, 2023); and (ii) the remainder paid on or before the last day of the month and in the amounts set forth in Schedule 1.2(a)(ii) to the Agreement.

19. Schedule 1.2(a)(ii) of the Agreement required Zenith to make the following payments:

| Date | Amount |
|---|---|
| September 2023 | $200,000 |
| October 2023 | $200,000 |
| November 2023 | $200,000 |
| December 2023 | $200,000 |
| January 2024 | $400,000 |
| February 2024 | $500,000 |
| March 2024 | $500,000 |

29422\8000\11864362v1

| Date | Amount |
|---|---|
| April 2024 | $500,000 |
| May 2024 | $500,000 |
| June 2024 | $600,000 |
| July 2024 | $600,000 |
| August 2024 | $600,000 |
| September 2024 | $600,000 |
| October 2024 | $600,000 |
| November 2024 | $600,000 |
| December 2024 | $500,000 |

20. In return, Section 1.3 of the Agreement provided that PPI would sell to Zenith certain machinery and inventory, including: (1) "all racks for raw materials (steel) handling;" (2) "3 x Horizontal CNC lathes (1 with additional vertical head);" (3) "1 x Haas 5 axis, CNC workstation included;" (4) "Lab equipment component for 'Hardness Testing';" (5) "2 X Peening machines used to peen over Mag Release Paddle rivet Rock Tumbler (currently located in lathe area);" and (6) "Five tools currently with vendor to be included – specifically, a. 2 sets of Flat stamping dies, b. Forearm, c. Grip, d. Cocking Lever tools/molds" (collectively, the "Collateral").

21. Given Zenith's history of nonpayment, PPI required Zenith to provide a purchase money security interest in the Collateral (the "PMSI").

22. The PMSI was memorialized in Section 1.2(b)(i) of the Agreement, which states as follows:

> To secure the prompt and complete payment, observance and performance when due (whether at stated maturity, by acceleration, or otherwise) of all of the Zenith Obligations, Zenith hereby mortgages, pledges, hypothecates to PPI, and grants to PPI a present and continuing security interest in, all of Zenith's right, title, and interest in, to and under the collateral described in Section 1.2(b)(ii) (the 'Collateral'). For the avoidance of doubt, it is the intent of Zenith that this Agreement create a valid 'purchase money security interest' (as such term is defined under the Uniform Commercial Code) in the Collateral (as such term is defined in Section 1.2(b)(ii)).

23. Indeed, in Section 1.2(b)(iii), Zenith expressly authorized PPI to take any actions necessary to perfect its PMSI, and Zenith agreed to do the same, including causing any third party to take any actions necessary for PPI to perfect its PMSI, which states as follows:

> Zenith hereby authorizes PPI to execute and file any financing statement or fixture filing on Zenith's behalf covering the Collateral and Zenit hereby obligates itself to execute, take actions, or cause any third party to take any such actions that PPI may, in its sole and absolute discretion, determine is necessary to effectuate and perfect its security interest and liens in the Collateral. **For the avoidance of doubt, the Parties stipulate, acknowledge, and agree that the failure by Zenith to comply with the provisions of this Section 1.2(b)(iii) shall be considered a material breach of this Agreement**.

(Emphasis added).

24. Throughout the course of negotiations, Zenith made numerous representations to PPI that it had the requisite authority to enter into the Agreement and give the PMSI.

25. These representations were memorialized in Section 3.1(a) of the Agreement, which states:

> Zenith hereby represents and warrants that: (1) Zenith has all requisite power and authority to execute and deliver this Agreement and to bind Zenith and consummate the transactions contemplated herein; (2) Zenith has full requisite right, power, and authority to execute and deliver this Agreement and to perform the obligations contemplated by this Agreement, and the execution, deliver, and performance hereof . . . ."

26. PPI relied on Zenith's representations, as memorialized in Section 3.1(a) of the Agreement, when executing the Agreement, and these representations induced PPI to enter into and execute the Agreement. Simply put, PPI would not have entered into and executed the Agreement had it known that Zenith did not have the authority to grant a PMSI on the Collateral.

*Zenith breached the Agreement*

27.     Zenith made the initial payment of $300,000 as contemplated in Section 1.2(a) of the Agreement.

28.     On or about August 14, 2023, PPI transferred its rights in the Collateral to Zenith.

29.     Pursuant to Section 1.3(a) of the Agreement, however, PPI provided the Collateral to Zenith "as is, where is," and Zenith was responsible for the costs of shipping, handling, and transportation in order to take possession of the Collateral.

30.     On or about September 1, 2023, PPI filed a UCC financing statement with the Virginia State Corporation Commission covering the Collateral.

31.     PPI has a valid, enforceable, and perfected purchase-money security interest in the Collateral.

32.     Zenith made the September 2023 payment of $200,000, as contemplated in Section 1.2(a) and Schedule 1.2(a)(ii) of the Agreement.

33.     Zenith did not make the October 2023 payment of $200,000 to PPI, as required by Section 1.2(a) of the Agreement.

34.     On November 15, 2023, PPI gave notice to Zenith that it had breached the Agreement for failing to the October 2023 payment of $200,000, and that Zenith was in default under the Agreement.

35.     Thereafter, Zenith did not make any other payments under the Agreement.

### IV.     Causes of Action

### COUNT ONE
### Breach of Contract

36.     PPI incorporates the preceding paragraphs as if fully set forth herein.

29422\8000\11864362v1

37. The Agreement is a valid, binding, and enforceable agreement between PPI and Zenith.

38. Zenith breached the Agreement in several ways, including, but not limited to:

   a. Zenith did not make the October 2023 payment in the amount of $200,000;

   b. Zenith did not make the November 2023 payment in the amount of $200,000;

   c. Zenith did not make the December 2023 payment in the amount of $200,000;

   d. Zenith did not make the January 2024 payment in the amount of $400,000;

   e. Zenith did not make the February 2024 payment in the amount of $500,000;

   f. Zenith did not make the March 2024 payment in the amount of $500,000; and

   g. Zenith did not make the April 2024 payment in the amount of $500,000.

39. As a direct and proximate result of Zenith's breaches, PPI has incurred damages in the amount of approximately $7.2 million, plus pre- and post-judgment interest, with the final and total amount to be proven at trial.

## COUNT TWO
### Judgment/Foreclosure

40. PPI incorporates the preceding paragraphs as if fully set forth herein.

41. PPI holds a perfected purchase money security interest in the Collateral pursuant to the Agreement.

42. Zenith is in default of its payment obligations to PPI under the Agreement.

43. Virginia Code § 8.9A-601(a)(1) provides that, after default, PPI may foreclose on the Collateral, or otherwise enforce its security interest, by any available judicial procedure.

44. Under the Agreement and Virginia Code § 8.9A-609(a)(1), (b), and (c), PPI is entitled to foreclose on the Collateral and take possession of said Collateral in light of Zenith's default.

45. Under the Agreement and Virginia Code § 8.9A-610(a) and (c), PPI is entitled to dispose of the Collateral by sale.

46. The Court should enter judgment to that effect, and enter judgment that Zenith is liable for any deficiency following the sale pursuant to the Agreement and Virginia Code § 8.9A-615(d)(2).

## COUNT THREE
### Detinue

47. PPI incorporates the preceding paragraphs as if fully set forth herein.

48. PPI has a property interest in the Collateral—namely, a valid, enforceable, and perfected purchase money security interest in the Collateral.

49. PPI has the right to immediate possession of the Collateral.

50. The Collateral is capable of identification, as set forth above.

51. The Collateral has value.

52. Upon information and belief, Zenith currently has possession of the Collateral.

53. In the alternative, Zenith had possession of the Collateral prior to the filing of this action.

54. Zenith has unlawfully withheld PPI's personal property, namely the Collateral.

55. Zenith remains in wrongful possession of the Collateral.

## COUNT FOUR
### Fraudulent Inducement—In the Alternative

56. PPI incorporates the preceding paragraphs as if fully set forth herein.

57. In the negotiations leading up to the execution of the Agreement, Zenith made representations of fact concerning its ability to enter into the Agreement and grant the PMSI on the Collateral.

58. These representations are memorialized in Section 3.1(a) of the Agreement, including, but not limited to:

    a. "Zenith has all requisite power and authority to execute and deliver this Agreement;"

    b. "Zenith has all requisite power and authority . . . to bind Zenith and consummate the transactions contemplated;"

    c. "Zenith has full requisite right, power, and authority to execute and deliver this Agreement;" and

    d. "Zenith has full requisite right, power, and authority . . . to perform the obligations contemplated by this Agreement, and the execution, deliver, and performance hereof."

59. Zenith made these representations of fact for the purpose of procuring the Agreement.

60. Zenith's representations of fact, including as set forth above, were false.

61. Zenith had previously entered into an agreement with a third party providing that Zenith would not grant a security interest in any of its assets without that third party's express written consent.

62. Upon information and belief, Zenith did not obtain that third party's express written consent to execute the Agreement, consummate the transaction contemplated therein, and/or grant PPI the PMSI secured by the Collateral.

63. Upon information and belief, Zenith concealed the fact that it did not obtain that third party's express written consent to execute the Settlement Agreement, consummate the transaction contemplated therein, and/or grant PPI the PMSI secured by the Collateral.

29422\8000\11864362v1

64. Zenith's misrepresentations of fact were material for several reasons including, but not limited to, PPI would not have entered into and executed the Agreement had it known that Zenith did not have the authority to grant a PMSI on the Collateral.

65. PPI relied on Zenith's material misrepresentations of fact when executing the Agreement, and was induced by them to enter into the Agreement.

66. As a direct and proximate result of Zenith's fraud, PPI has incurred damages in an amount to be proven at trial.

WHEREFORE, PPI/TimeZero, Inc. respectfully requests that the Court enter judgment in favor of PPI and against Zenith as follows:

A. As to Count I, for PPI's damages resulting from its breach of the Agreement in an amount to be determined at the trial of this matter;

B. As to Count II, award PPI immediate possession of the Collateral and for any deficiency following the sale pursuant to the Agreement and Virginia Code § 8.9A-615(d)(2);

C. As to Count III, award PPI immediate possession of the Collateral;

D. As to Count IV, and in the alternative to Count I, rescinding the Agreement and awarding damages in the amount of $7,200,000.00, along with its reasonable attorneys' fees;

E. Awarding PPI its costs and expenses in this matter;

F. Awarding PPI pre-judgment and post-judgment interest; and

G. Such other and further relief as is just, equitable, and proper.

Respectfully submitted this 20th day of May, 2024.

                 PPI/TIMEZERO, INC.

                 /s/ Andrew M. Bowman

Herschel V. Keller (VSB No. 41605)
GENTRY LOCKE
801 Main Street, 11th Floor
Lynchburg, Virginia 24504
Telephone: 434.455.9944
Fax:    540.983.9400
Email:   keller@gentrylocke.com

Andrew M. Bowman (VSB No. 86754)
GENTRY LOCKE
10 Franklin Road, S.E., Suite 900
Roanoke, Virginia 24011
Telephone: 540.983.9404
Fax:    540.983.9400
Email:   bowman@gentrylocke.com

Ryan J. Starks (VSB No. 93068)
GENTRY LOCKE
919 E. Main Street, Suite 1130
Richmond, Virginia 23219
Telephone: 804.956.2062
Fax:    540.983.9400
Email:   starks@gentrylocke.com