CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
December 18, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| PPI/TimeZero, Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Zenith Firearms, Inc., | ) |
| | ) |
| Defendant, | ) |
| | )    Civil Action No. 3:24-cv-00037 |
| v. | ) |
| | ) |
| SouthStar Financial, LLC | ) |
| | ) |
| and | ) |
| | ) |
| Critzer Road Holdings, LLC, | ) |
| | ) |
| Intervenor-Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff PPI/TimeZero, Inc. ("PPI") alleges that Defendant Zenith Firearms, Inc.

("Zenith") breached a settlement agreement, and that Intervenor Defendants Critzer Road

Holdings, LLC ("Critzer") and SouthStar Financial, LLC ("SouthStar") interfered with that

settlement agreement, conspired against PPI, and executed a fraudulent real estate transaction

to shield Zenith's assets from PPI.  This matter is before the court on Zenith's motion to

dismiss PPI's second amended complaint, (Dkt. 113), PPI's motion to dismiss Zenith's second

amended counterclaims, (Dkt. 109), Southstar's motion to dismiss PPI's counterclaims, (Dkt.

93), and Critzer's motion to dismiss PPI's counterclaims, (Dkt. 121).

For the reasons stated below, the court will deny Zenith's motion to dismiss, (Dkt. 113), grant in part and deny in part PPI's motion to dismiss, (Dkt. 109), grant SouthStar's motion to dismiss, (Dkt. 93), and grant Critzer's motion to dismiss, (Dkt. 121).

## I.    Background

### A.  Factual History[1]

#### 1.  Business Relationship

In May 2021, PPI agreed to manufacture MP-5 style firearms, magazines, and spare parts for Zenith pursuant to a Manufacturing Services Agreement ("MSA").  (Second Am. Compl. ¶ 13 (Dkt. 105) [hereinafter "PPI Sec. Am. Compl."].)  Over the following year, Zenith issued multiple purchase orders pursuant to the MSA, and PPI secured materials, parts, and machinery in reliance on these purchase orders.  (*Id.* ¶¶ 14–16.)  PPI began to manufacture the requested firearms and deliver them to Zenith.  (*Id.* ¶ 16.)  Zenith quickly fell behind on payments under the MSA and owed PPI "several million dollars" for firearm components by mid-2022.  (*Id.* ¶ 17.)

#### 2.  The Settlement Agreement

To avoid the costs of litigation, PPI and Zenith negotiated a settlement, ultimately reaching a Mutual Release and Settlement Agreement ("the Settlement Agreement") dated August 4, 2023.  (*Id.* ¶¶ 18–19.)  Under the Settlement Agreement, Zenith agreed to pay PPI

---

[1] The facts stated in subsections I.A.1 through I.A.3 are taken from PPI's Second Amended Complaint, (Dkt. 105), and are assumed to be true for purposes of resolving Zenith's Motion to Dismiss, (Dkt. 113).  *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).  The facts stated in subsection I.A.4 are taken from Zenith's Second Amended Counterclaims against PPI, (Dkt. 99), and are assumed to be true for purposes of resolving PPI's Motion to Dismiss, (Dkt. 109).  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  The facts stated in subsection I.A.5 are taken from PPI's Counterclaims against SouthStar, (Dkt. 106), and are assumed to be true for purposes of resolving SouthStar's Motion to Dismiss, (Dkt. 93).  *Id.*  The facts stated in subsection I.A.6 are taken from PPI's Counterclaims against Critzer, (Dkt. 101), and are assumed to be true for purposes of resolving Critzer's Motion to Dismiss, (Dkt. 121).  *Id.*

over $7 million over the next 16 months to purchase PPI's inventory of materials and machinery, effectively bringing its production "in house." (*Id.* ¶¶ 18, 20–21.) The first payment ("the Effective Date Payment") was due on August 4, 2023, the day the Settlement Agreement went into effect. (*Id.* ¶ 20.) The specific Machinery[2] covered was itemized in Section 1.3 of the Settlement Agreement. (*Id.* ¶ 25.)

The Settlement Agreement also obligated Zenith to enter into the "Flats Transaction" with one of PPI's suppliers, Seves, on or before August 18, 2023, and to provide PPI with financial reporting every month. (*Id.* ¶¶ 22–24, 62.) Given Zenith's history of nonpayment, the Settlement Agreement memorialized Zenith's grant of a purchase money security interest ("PMSI") in the inventory and Machinery ("Collateral," collectively) for PPI to secure payment. (*Id.* ¶¶ 26–27.) PPI relied on Zenith's purported authority to grant the PMSI and would not have signed the Settlement Agreement without that guarantee. (*Id.* ¶ 33.) As part of the Settlement Agreement, PPI was obligated to transfer its rights in certain Intellectual Property[3] to Zenith. (*Id.* ¶¶ 49–52.)

3. <u>The Settlement Agreement's Aftermath (According to PPI)</u>

On August 7, 2023, and no later than August 18, 2023, PPI transferred its rights in the inventory, Machinery, and Intellectual Property to Zenith. (*Id.* ¶¶ 36–37, 46, 51–52.) No documents of title were transferred for the inventory, Machinery, and Intellectual Property. (*Id.* ¶¶ 35, 38–43, 45, 47, 50, 53.) No documents of title even existed for the Machinery. (*Id.*

---

[2] The court uses "Machinery" throughout this opinion to refer to the machinery itemized in Section 1.3 of the Settlement Agreement. (*See* PPI Sec. Am. Compl. ¶ 25.)

[3] The court uses "Intellectual Property" throughout this opinion to refer to the intellectual property identified in the Settlement Agreement. Specifically, it includes "all of the intellectual property provided in written or electronic format to PPI by Zenith . . . IP includes but is not limited to Technical Engineering Drawings and/or Diagrams and Technical Instruction." (*See* Zenith Sec. Am. CC ¶ 12.)

- 3 -

¶ 43.)  On or about September 1, 2023, PPI filed a UCC financing statement with the Virginia State Corporation Commission that covered the Collateral, including the inventory and Machinery.  (*Id.* ¶ 54.)

PPI worked diligently to facilitate the "Flats Transaction" between Zenith and Seves by the agreed upon date of August 18, 2023, but upon PPI's information and belief, Zenith did not have sufficient funds to pay Seves.  (*Id.* ¶¶ 65–69.)  Zenith was not transparent with PPI about its financial troubles or about the fact that it had assigned many of its accounts receivable to its financier, SouthStar.  (*Id.* ¶¶ 70–77.)

Zenith was also late on its payments under the Settlement Agreement.  Zenith failed to make the Effective Date Payment on August 4, 2023.  (*Id.* ¶ 58.)  Instead, on August 9, 2023, SouthStar paid PPI the full $300,000 on Zenith's behalf.  (*Id.* ¶¶ 59, 61.)  Zenith did not make its $200,000 payment due for the month of September, and SouthStar yet again stepped in to pay it on Zenith's behalf on October 4, 2023.  (*Id.* ¶ 108.)  Finally, after PPI notified Zenith in mid-November of Zenith's breach of the October payment obligation and PPI's intention to foreclose on the machinery, SouthStar paid PPI $200,000 on Zenith's behalf "in partial satisfaction" of the payment obligations that were due in October and November 2023.  (*Id.* ¶¶ 118–22.)  Zenith (or SouthStar on Zenith's behalf) did not make any further payments.  (*Id.* ¶ 141.)

4.  The Settlement Agreement's Aftermath (According to Zenith)

After the Settlement Agreement was reached, PPI failed to transfer its rights to all the machinery and Intellectual Property within 10 business days of August 4, 2023.  (Zenith Firearms Second Am. Counterclaims Against Pl. and Counterclaim-Def. PPI ¶¶ 17–19 (Dkt.

99) [hereinafter "Zenith Sec. Am. CC"].)  The Settlement Agreement provided that "time is of the essence" and that PPI was "strictly bound" to its obligations to convey the machinery and Intellectual Property on or before August 18, 2023.  (*Id.* ¶ 15.)  Specifically, PPI never conveyed, assigned, or transferred its rights the "(6) [f]ive tools currently with vendor to be included . . . (a) 2 sets of Flat stamping dies; (b) Forearm; (c) Grip; and (d) Cocking Lever tools/molds" ("the Tools and Die Molds").  (*Id.* ¶¶ 18, 20.)  Upon Zenith's information and belief, at the time Zenith filed its Second Amended Counterclaims, PPI had not yet prepared any contracts, purchase orders, bills of sale or lading, or other documents to facilitate the transfer of PPI's rights in the Tools and Die Molds to Zenith, as would be customary in their business dealings.  (*Id.* ¶ 21.)  Nor did it physically transfer the Tools and Die Molds to Zenith by August 18, 2023.  (*Id.* ¶ 22.)

In addition to not transferring the Tools and Die Molds, to the best of Zenith's knowledge, information, and belief, PPI has not taken any action to effectuate the conveyance, assignment, or transfer of any of the Intellectual Property promised by the Settlement Agreement.  (*Id.* ¶ 29.)  Nor has PPI taken any action to advise third parties of Zenith's ownership of the Intellectual Property or warn others about using it without Zenith's express consent, as required by the Settlement Agreement.  (*Id.* ¶ 31.)  PPI also did not, as promised in the Settlement Agreement, provide Zenith with information on canceled NDAs and details of Intellectual Property materials provided to vendors and manufacturers.  (*Id.* ¶ 30.)

Additionally, PPI failed to use "commercially reasonable efforts" to "assist Zenith in remedying the issues associated with the Flats Transaction."  (*Id.* ¶ 25.)  Although PPI agreed to transfer the Tools and Die Molds to Zenith, the Tools and Die Molds were possessed by

Seves, not PPI, during the relevant times. (*Id.* ¶ 41.) PPI failed to "undertake any efforts to transfer the interest in the [T]ools and [D]ie [M]olds that PPI had represented to Zenith that PPI possessed" in the Settlement Agreement. (*Id.* ¶ 46.)

Despite this, Zenith "fulfilled its payment obligations under the [Settlement] Agreement" by making the Effective Date Payment ($300,000), the September payment ($200,000), and an additional $200,000 payment in December 2023. (*Id.* ¶ 33–34.) Zenith ceased making any further payments to PPI because of PPI's material breach. (*Id.* ¶¶ 35–36.)

5. SouthStar's Involvement[4]

SouthStar filed a UCC-1 Financing Statement on or about October 16, 2018, that apparently covered all of Zenith's assets "now owned or hereafter acquired." (PPI's Answer & Aff. Defenses & Counterclaims in Reply Against Southstar ¶ 9 (Dkt. 106) [hereinafter "PPI CC SouthStar"].) SouthStar and Zenith have entered into numerous financial agreements, including the "Factoring Agreement" in February 2019 and the "Payment Redirection Agreement" in December 2022. (*Id.* ¶¶ 9, 13.)

Zenith and PPI reached the Settlement Agreement "in close consultation" with SouthStar, who "controlled" Zenith's compliance with its payment obligations under the Settlement Agreement. (*Id.* ¶¶ 16, 24.) The Settlement Agreement included a covenant not to sue SouthStar. (*Id.* ¶ 30.) Zenith and SouthStar had an "understanding" that SouthStar would fund Zenith's payment obligations under the Settlement Agreement and pay PPI on Zenith's behalf. (*Id.* ¶ 25.) After consulting with Zenith, SouthStar did not make the payment that was due in October 2023 to PPI. (*Id.* ¶ 40.) Instead, it made a payment in partial

---

[4] The court cites here to Dkt. 106, the unredacted version of PPI's counterclaims against SouthStar, (Dkt. 82).

satisfaction and set up an unsuccessful meeting among the three parties at SouthStar's offices. (*Id.* ¶ 40, 45, 47–48.)

    6.   The Real Estate Transaction

Critzer was organized by SouthStar's COO, Lindsey Cooper, on or about December 5, 2023. (PPI's Answer & Aff. Defenses & Counterclaims Against Critzer ¶ 8 (Dkt. 101) [hereinafter "PPI CC Critzer"].) Critzer had knowledge of the Settlement Agreement between PPI and Zenith and the subsequent breaches of the Settlement Agreement through its shared principals with SouthStar. (*Id.* at 15.) On December 15, 2023, Critzer and various Zenith entities, including Zenith, entered into a real estate transaction ("Real Estate Transaction"). (*Id.* at 15–17.) This transaction was "implemented" through various deeds, assignment, resolutions, guaranties, and agreements. (*Id.*) Notably, various parcels of real property were transferred from Kaya Properties, LLC ("Kaya Properties") to Critzer. (*Id.*) As part of the Real Estate Transaction, Zenith and its affiliated entities would deed all their real property to Critzer. (*Id.* at 17–18.) They would also assign a lease, making Critzer its landlord with all of its rights under the lease. (*Id.* at 18.) These rights included, according to the lease amendment, "all statutory landlord lien rights available under Virginia Law including, but not limited to, VA Code Ann. § 8.01-130.6." (*Id.* at 19.) Zenith represented that the "the Personal Property stored on the Premises is subject to landlord's lien for all sums due or to become due under the Lease, including, but not limited to, the Outstanding Rent." (*Id.*)

The same day, the parties signed a lease amendment acknowledging that Zenith, at the time, owed Critzer $240,000 in outstanding rent. (*Id.* at 18.) This rent was not paid as of June 2025, upon PPI's information and belief. (*Id.* at 18.) The outstanding rent enabled Critzer to

attempt to "shield Zenith from PPI's efforts to foreclose on its PMSI by asserting purported 'landlord lien rights' for allegedly unpaid rent."  (*Id.* at 19.)

## B. Procedural History

This case now involves four parties and several amended pleadings, including crossclaims and counterclaims.  This section is organized by defendant.

### 1. Zenith

On May 20, 2024, PPI filed a complaint against Zenith in this court.  (*See* Dkt. 1.)  The complaint focused on the breach of the Settlement Agreement and stated four causes of action against Zenith: breach of contract, judgment/foreclosure, detinue, and fraudulent inducement.  (*Id.* ¶¶ 36–66.)  Zenith filed its answer and counterclaims against PPI on June 26, 2024, and amended its counterclaims about one month later.  (Dkts. 5, 15.)  The counterclaims included breach of contract, declaratory judgment (related to the breach), and unjust enrichment.  (*See* Dkt. 15 ¶¶ 30–59.)  PPI moved to dismiss one aspect of the breach claim: the allegation that Zenith failed to physically transport the Tools and Die Molds to Zenith by August 15, 2023.  (*See id.* ¶ 33; Dkt. 17 at 5, 9 n.3).  PPI moved to dismiss the other two counts entirely.  (Dkt. 17 at 2.)

On November 13, 2024, the court granted PPI's motion, dismissing the breach of contract claim, declaratory judgment, and unjust enrichment claims.  (*See* Dkt. 44 at 10, 13, 15.)  As to the first count, the court specifically found that the Settlement Agreement did not create an obligation for PPI to physically transport the Tools and Die Molds to Zenith.  (*Id.* at 10.)  After the court allowed Critzer and SouthStar to intervene in the case, PPI filed an amended complaint against Zenith on January 8, 2025.  (Dkt. 59.)

On June 10, 2025, Zenith filed its second amended counterclaims against PPI. (Zenith Sec. Am. CC (Dkt. 99).) Zenith realleged its breach of contract claim (with two new allegations), its declaratory judgment claim, and its unjust enrichment claim. (*See id.* ¶¶ 55–64, 105–22.) It also added three new claims: breach of the implied covenant of good faith and fair dealing, fraudulent inducement, and, in the alternative, negligent misrepresentation. (*See id.* ¶¶ 65–104.) On June 24, 2025, PPI filed a motion to dismiss the counterclaims, (Dkt. 109), which is now before the court.

On June 17, 2025, PPI filed its second amended complaint against Zenith. (PPI Sec. Am. Compl. (Dkt. 105).) PPI alleges the same four counts as its original complaint: breach of contract, judgment/foreclosure, detinue, and fraudulent inducement. (*See id.* ¶¶ 139–70.) On June 30, 2025, Zenith filed a motion to dismiss in part PPI's second amended complaint, (Dkt. 113), which is now before the court. Zenith asks the court to dismiss any of PPI's claims that are "based on Zenith's allegedly late payments of the Effective Date Payment and the September 2023 Payment" and to hold, "as a matter of law, that the earliest date Zenith could have breached section 1.2(a) of the [Settlement] Agreement based on a failure to make the payments listed therein is November 1, 2023." (*See* Zenith's MTD Br. at 10–11 (Dkt. 114).)

2. SouthStar

On December 23, 2024, the court allowed SouthStar to intervene in the case. (*See* Dkt. 55.) PPI filed an amended complaint against Zenith on January 8, 2025. (Dkt. 59.) Two days later, SouthStar filed an answer that included crossclaims against Zenith and counterclaims against PPI. (Dkt. 61.) PPI moved to dismiss Southstar's counterclaims solely as to Southstar's claim for attorney's fees. (*See* Dkt. 68.) On April 25, 2025, the court granted PPI's

partial motion to dismiss, finding that SouthStar could not claim attorney's fees against PPI in its counterclaim. (*See* Dkt. 78 at 6.)

On May 12, 2025, PPI filed counterclaims against SouthStar. (PPI CC Southstar (Dkt. 106).)[5] PPI requests declaratory judgment on the priority of its PMSI and bring claims of tortious interference with contract, common law civil conspiracy, and statutory business conspiracy. (*See id.* at 22–24.) On June 2, 2025, SouthStar filed a motion to dismiss the counterclaims, (Dkt. 93), which is now before the court.

    3.  <u>Critzer</u>

On December 23, 2024, the court allowed Critzer to intervene in the case. (*See* Dkt. 55.) Critzer filed an answer with a crossclaim against Zenith and a counterclaim against PPI: a request for declaratory judgment to establish the priority of Critzer's security interests and confirm its possession of landlord lien rights. (*See* Dkt. 60 at 9–11.) Critzer also requested attorney's fees. (*Id.* at 18.) PPI moved to dismiss the counterclaim on February 7, 2025. (Dkt. 69.) On May 29, 2025, the court granted PPI's motion to dismiss in part, denying all except for assertions of a superior lien under Va. Code § 8.01-130.6 and § 8.01-130.9. (*See* PPI MTD Critzer CC Mem. Op. at 17 (Dkt. 90).) Specifically, the court found that, at the motion to dismiss stage, Critzer had stated a claim under those two subsections of the Virgina code, and that the issue of when the competing liens emerged was better suited for summary judgment. (*See id.* at 13, 15.)

---

[5] PPI's original counterclaims against SouthStar were filed with redactions. (*See* Dkt. 82.) Pursuant to the court's order, (Dkt. 100), PPI filed an unredacted version of its counterclaims on June 17, 2025, (Dkt. 106). The court will cite and reference the unredacted version.

On June 12, 2025, PPI filed counterclaims against Critzer. (PPI CC Critzer (Dkt. 101).) PPI requests declaratory judgment on the priority of its PMSI and brings claims of fraudulent conveyance and tortious interference with business expectancy. (*See id.* at 19–24.) On July 17, 2025, Critzer filed a motion to dismiss the counterclaims, (Dkt. 121), which is now before the court.

## II.     Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616. "A counterclaim is treated like any other claim, and when it is challenged under Federal Rule of Civil Procedure 12(b)(6) the same standards apply." *Rsrv. at Winchester I, LLC v. R 150 SPE, LLC*, No. 3:21-cv-00008, 2022 WL 2161518, at *3 (W.D. Va. June 15, 2022) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

- 11 -

### III.    Analysis

#### A. Zenith's Motion to Dismiss PPI's Second Amended Complaint (Dkt. 113)

In its Second Amended Complaint, PPI alleges that Zenith breached the Settlement Agreement in several ways, including a failure to make payments according to the payment schedule and a refusal to enter into the "Flats Transaction."  (PPI Sec. Am. Compl. ¶ 141.) Specifically, PPI alleges that Zenith breached the Settlement Agreement when it failed to make the Effective Date Payment of $300,000 on August 4, 2023, or the scheduled $200,000 payment by the due date of September 29, 2023.  (*Id.* ¶¶ 56–58, 99.)  In its motion to dismiss PPI's second amended complaint, Zenith asks the court to dismiss any claims that are based on these two alleged breaches and to find as a matter of law that "that the earliest possible date Zenith could have breached the [Settlement] Agreement by failing to make a payment contained in Section 1.2(a) of the [Settlement] Agreement is November 1, 2023."  (Zenith MTD Br. at 1–2, 6.)

Zenith alleges that SouthStar's fulfillment of the Effective Date Payment and the September payment on Zenith's behalf, albeit late, cured those two breaches.  (*Id.* at 3–4.) And under Section 4.1 of the Settlement Agreement, Zenith argues, PPI does not have a right to exercise remedies in law or equity pursuant to breaches that have been cured.  (*Id.*)  But even if Zenith is correct here—which the court does not hold at this time—PPI contends that Zenith still breached other parts of the Settlement Agreement before November 1, 2023, by failing to enter into and provide assurances regarding the "Flats Transaction" and not providing PPI with detailed financial reports.  (*See* PPI Sec. Am. Compl. ¶¶ 66–68, 70–75, 141.)  Also, none of PPI's claims beyond breach of contract—Judgment/Foreclosure (Count

2), Detinue (Count 3), or Fraudulent Inducement (Count 4)—is based on the failure to make the Effective Date Payment or the late September payment.  Since PPI has sufficiently alleged that Zenith breached the Settlement Agreement based on a variety of failures at some point before November 1, 2023, the court will deny Zenith's motion to dismiss, (Dkt. 113).

**B. PPI's Motion to Dismiss Zenith's Second Amended Counterclaims (Dkt. 109)**

In its second amended counterclaims against PPI, Zenith alleges a breach of contract (Counterclaim 1), breach of the implied covenant of good faith and fair dealing (Counterclaim 2), fraudulent inducement (Counterclaim 3), negligent misrepresentation (Counterclaim 4), declaratory judgment (Counterclaim 5) and unjust enrichment (Counterclaim 6).  (Zenith Sec. Am. CC at 11–21 (Dkt. 99).)   PPI filed a motion to dismiss the Second Amended Counterclaims.  (Dkt. 109.)

1.  <u>Counterclaim 1 (Breach of Contract)</u>

In Counterclaim 1 against PPI, Zenith alleges that PPI breached the Settlement Agreement first, on or before August 19, 2023, in multiple respects.[6]  (Zenith Sec. Am. CC ¶¶ 57–58.)  Specifically, Zenith alleges that PPI failed to "convey, assign, or otherwise transfer" within 10 business days PPI's interests in the Tool and Die Molds and in the Intellectual Property.  (*See id.* ¶ 57.)  PPI argues that these "interests" transferred to Zenith upon the

---

[6] PPI explicitly does not challenge, at this stage, Zenith's allegations that PPI failed to "use commercially reasonable efforts to resolve any issues associated with the Flats Transaction" or that PPI failed to "transfer to Zenith information on the cancelations of all Non-Disclosure Agreements ('NDAs'), Foreign and Domestic, to all vendors and/or manufacturers and the associated details of the intellectual property sent/provided to these same vendors and/or manufacturers."  (Zenith Sec. Am. CC ¶ 57; PPI MTD Br. at 25 n.8.)  Thus, the court will not address these allegations here.  Also, Zenith realleges a breach based on PPI's failure to transport the Tools and Die Molds, acknowledging that the court has previously dismissed this claim as stated.  (Zenith Sec. Am. CC ¶ 57 n.9.)  Zenith states that it includes this allegation simply to preserve its rights in the event of an appeal.  (*Id.*)  For the same reasons as the court explained in its previous opinion, (*see* Dkt. 44 at 9–10), the court will grant PPI's motion to dismiss as to Zenith's claim in ¶ 57(c) of its counterclaim.

effective date of the Settlement Agreement, since Zenith took these interests "as is, where is" and the Settlement Agreement did not require PPI to deliver any tangible documents of title. (PPI MTD Br. at 4 (Dkt. 110).)  PPI also argues that Va. Code § 8.2-401 applies and establishes that PPI was not required to convey a tangible document of title to Zenith.  (*Id.* at 12.)  Under the statute, if "no documents of title are to be delivered, title passes at the time and place of contracting."  Va. Code Ann. § 8.2-401(3)(b).  PPI argues "no documents of title [were] to be delivered" because no documents of title existed for the Tools and Die Molds and the Intellectual Property, and the Settlement Agreement did not "expressly provide that PPI was to deliver a document of title" for either the Tools and Die Molds or the Intellectual Property. (PPI MTD Br. at 13–14.)  Zenith, though, alleges that it "was customary during the course of their business dealings for Zenith and PPI to use [tangible documents] to convey, assign, or transfer property between the parties."  (Zenith Sec. Am. CC ¶ 21.)  Zenith argues that this allegation sufficiently states, at this stage, that PPI was required under the Settlement Agreement to provide Zenith with a tangible document of title to convey the interests.  (Dkt. 117 at 4.)

Even if the Settlement Agreement does not explicitly require PPI to transfer tangible documents of title, the court finds Zenith has alleged enough to state a claim that PPI was required under the Settlement Agreement to take at least *some action* to convey the relevant interests, and that it failed to do so.  The Settlement Agreement states that "PPI *shall* convey, assign, or otherwise transfer its interests."  (*See* Zenith Sec. Am. CC ¶¶ 11–12 (emphasis added).)  The requirement to assign rights in the future indicates that the interests may not have transferred immediately to Zenith at the time of contracting, but that they will be

- 14 -

transferred. *See, e.g., Realvirt, LLC v. Lee*, 195 F. Supp. 3d 847, 859 (E.D. Va. 2016) (explaining that contract language stating that a party "agrees to assign" indicates a promise to assign rights in the future, not an immediate transfer of rights). Zenith's allegations suggesting the customary course of dealing between the parties, coupled with the plain language of the agreement, leads the court to conclude that Zenith, at this stage, has sufficiently alleged a plausible claim with respect to the allegations in Paragraphs 57(b) and (d) of Counterclaim 1. Therefore, the court will deny PPI's motion to dismiss, (Dkt. 109), as to these allegations in Zenith's Counterclaim 1 (Breach of Contract).

Zenith also alleges that PPI breached the Settlement Agreement by failing to "advise third parties of Zenith's ownership of the Intellectual Property and of the need to secure express consent from Zenith for all goods produced, sold, or transferred pursuant to the Intellectual Property within ten (10) business days of the effective date of the [Settlement] Agreement." (Zenith Sec. Am. CC ¶ 57.) PPI argues in response that there was no such 10-day period noted in the Settlement Agreement for these obligations, and that it was only required to use "commercially reasonable efforts." (PPI MTD Br. at 3.) Zenith alleges—and PPI does not dispute—that the relevant section of the Settlement Agreement stated:

> **Within ten (10) business days of the Effective Date** or as otherwise agreed in writing between the parties, PPI shall return, convey, assign, or otherwise transfer its rights to all of the intellectual property provided in written or electronic format to PPI by Zenith ("the Intellectual Property"). Together with information on the cancelations on all NDA's, Foreign and Domestic, to all vendors/manufacturers and associate[d] [(*sic*)] details of IP materials sent/provided to them must be delivered to Zenith. IP includes but is not limited to Technical and Engineering Drawings and/or Diagrams and Technical Instructions. PPI expressly disclaims any title, license, lease, authorization, or any authorized usage of the Intellectual Property. Zenith further understands that it is taking the Intellectual Property "as is where is" and shall be responsible for bearing all costs related to the shipping, handling, and transportation of the Intellectual Property. PPI shall not be liable, directly or indirectly, for any damage or defect to the Intellectual Property that may be made as part of any shipping

- 15 -

or transportation of the Intellectual Property to Zenith. **PPI shall use commercially reasonable efforts to notify any Third Party (as defined herein) of whom PPI has knowledge that such Third Party has possession of the Intellectual Property that (i) Zenith retains any rights PPI had to the Intellectual Property, and (ii) subject to any applicable definitive agreements to the contrary, no good produced in connection with the Intellectual Property may be sold, given, or disposed of without Zenith's consent.**

(Zenith Sec. Am. CC ¶ 12) (emphasis added).

PPI argues that the Settlement Agreement "does not impose an obligation on PPI to notify third parties within ten (10) days" because the 10-day limitation is an "introductory clause which modifies PPI's obligation in the first sentence." (PPI MTD Br. at 10; Dkt. 124 at 3.) Zenith contends that the 10-day limitation in the first sentence still modifies the last sentence and "[a]t best, the [Settlement] Agreement's language is ambiguous." (Dkt. 117 at 4.) PPI replies that the language is not ambiguous, and that Zenith fails explain how the language is ambiguous. (Dkt. 124 at 4.)

Interpretation of a contract is a question of law for the court to consider. *Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*, 662 S.E.2d 77, 80 (Va. 2008). To determine whether a contract's language is ambiguous, the court looks "look[s] at the words at issue within the four corners of the [contract] itself." *Eure v. Norfolk Shipbuilding. & Drydock Corp.*, 561 S.E.2d 663, 668 (Va. 2002). A contract term is ambiguous if it can reasonably carry "two or more meanings, [be] understood in more than one way, or [refer] to two or more things at the same time." *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 455 S.E.2d 229, 232 (Va. 1995). The court finds PPI's argument to be more persuasive. The 10-day limitation unambiguously modifies the first sentence in the relevant section. But five sentences sit between the first sentence and the last sentence, and the 10-day limitation does not appear to modify all of them. If Zenith's

argument is correct, and the 10-day limitation modifies the entire section, then it would also modify, for example, the sentence outlining Zenith's responsibility for transportation of the Intellectual Property and the sentence detailing PPI's waiver of liability for any damage during transportation. Reading the limitation to apply to the entire section, including the last sentence, would therefore contradict the plain language of the agreement. Accordingly, the court will grant PPI's motion to dismiss, (Dkt. 109), as to Zenith's allegations in Paragraphs 57(f) and (g) of Zenith's Counterclaim 1.[7]

1. Counterclaim 2 (Breach of Implied Covenant)

In Counterclaim 2, Zenith alleges that PPI violated the implied covenant of good faith and fair dealing. (Zenith Sec. Am. CC ¶¶ 65–74.) According to Zenith, PPI knew or should have known that it "lacked any ownership or possessory interest in the Tools and Die Molds," and that it could not "use reasonably commercial efforts to assist with any issues in the Flats Transactions," but represented so in the Settlement Agreement. (*Id.* ¶¶ 68, 70.) Zenith also alleges that PPI failed to "make any effort to transfer its interest in the Tools and Die Molds to Zenith" until long after the 10-day period provided for in the contract. (*Id.* ¶ 69.) PPI disputes these alleged misrepresentations, but argues that either way, Zenith's claims largely refer to conduct that preceded the Settlement Agreement, and the implied covenant of good faith and fair dealing applies to conduct *after* a contract has been formed. (*See* PPI MTD Br. at 22.)

_____

[7] Zenith acknowledges that the court previously dismissed its allegation in Paragraph 57(c) of Counterclaim 1 and it realleges it in order to preserve an appeal. (*See* Zenith Sec. Am. CC at 11 n.9.) For the same reasons as the court explained in its previous opinion, (*see* Dkt. 44 at 7–10), the court will grant PPI's motion to dismiss, (Dkt. 109), as to this allegation.

In Virginia, "every contract contains an implied covenant of good faith and fair dealing." *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 251 (4th Cir. 2025) (quoting *Wolf v. Fed. Nat'l Mortg. Ass'n*, 512 F. App'x 336, 345 (4th Cir. 2013)). "Under that implied covenant, when a party exercises *contractual rights*, it may not do so dishonestly or in bad faith." *Id.* (emphasis added). But a "contractual relationship between the parties" is an essential prerequisite to a breach of the implied covenant of good faith and fair dealing. *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013). So, PPI's actions "before contract execution are not considered in a claim for breach of the implied covenant." *See Fluor Fed. Sols., LLC v. BAE Sys. Ordnance Sys., Inc.*, No. 7:19-cv-00698, 2023 WL 218972, at *4 (W.D. Va. Jan. 15, 2023). PPI moves to dismiss the "aspects of [Zenith's] Counterclaim Two" that are "based on PPI's conduct prior to the execution of the [Settlement] Agreement." (PPI MTD Br. at 22–23.) And except for the allegations in Paragraph 69, Zenith's allegations under Counterclaim 2 are based on PPI's conduct prior to the execution of the Settlement Agreement. (*See* Zenith Sec. Am. CC ¶¶ 65–74.)

In Paragraph 69, Zenith alleges that "PPI failed to make any effort to transfer its interest in the Tools and Die Molds to Zenith until September or October of 2023, long after the ten (10 ) [sic] business day period PPI had to transfer its interests in the Tools and Die Molds under the [Settlement] Agreement." (Zenith Sec. Am. CC ¶ 69.) Zenith asserts that this action was "unfair and committed in bad faith." (*Id.* ¶ 73.) In Virginia, the duty of good faith and fair dealing may be breached if a party exercises contractual discretion in bad faith or exercises a contractual right dishonestly. *Stoney Glen*, 944 F. Supp. 2d at 466 (citations omitted). Zenith does not allege that PPI's conduct in Paragraph 69 was dishonest or in bad

faith beyond the conclusory allegation at the end of the section that "PPI's actions, as described above, were unfair and committed in bad faith." (Zenith Sec. Am. CC ¶ 73.) In other words, Zenith does not allege any facts to suggest that PPI's conduct "surpassed the arbitrary and creeped waywardly into the dishonest." *Marcus v. Dennis*, No. 1:21-cv-01085, 2022 WL 1527524, at *5 (E.D. Va. May 13, 2022). In fact, Zenith admits that PPI believed, at some point, that it had already paid for the Tools and Die Molds, and that it did "not sit well" with PPI that the Tools and Die Molds were being "withheld" by Seves. (Zenith Sec. Am. CC ¶¶ 49–50.)

An "allegation of bad faith is a legal conclusion that stands only insofar as it is supported by factual allegations." *Stoney Glen*, 944 F. Supp. 2d at 466. Zenith therefore fails to sufficiently allege that PPI's conduct was dishonest or in bad faith, because it did not provide any factual allegations. *Cf. Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450–51 (E.D. Va. 2009) (finding that Plaintiff successfully alleged a breach of the implied covenant because Defendant purposely did not inform Plaintiff of a high risk of medical disqualification from the contracted-for experience until Plaintiff had already made non-refundable payments); *In re Capital One 360 Sav. Acct. Int. Rate Litig.*, 779 F. Supp. 3d 666, 703–04 (E.D. Va. 2024) (finding that Plaintiffs successfully alleged Defendant's breach by describing that Defendant purposely buried references to a certain type of savings account to prevent Plaintiffs from discovering that they were not receiving a promotional interest rate). Accordingly, because the implied covenant does not apply to conduct prior to contract execution, and Zenith fails to sufficiently allege bad faith in Paragraph 69, the court will grant PPI's motion to dismiss, (Dkt. 109), as to Counterclaim 2.

2. Counterclaim 3 (Fraudulent Inducement)

In Counterclaim 3, Zenith alleges fraudulent inducement against PPI for falsely representing that PPI had the ability to transfer the Tools and Die Molds to Zenith, when it did not, under the Settlement Agreement. (*See* Zenith Sec. Am. CC ¶¶ 75–87.) To state a claim for fraudulent inducement in Virginia, a plaintiff must plead: "(1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead [sic], and (6) resulting damage to the party misled." *Paragon Def. Sols., Inc. v. Jadcap Mach. Works, Inc.*, No 1:22-cv-01425, 2023 WL 4937393, at *2 (E.D. Va. July 10, 2023) (quoting *Hitachi Cred. Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999)). Zenith alleges that PPI's promise in the Settlement Agreement to transfer the rights to the Tools and Die Molds within 10 business days was fraudulent because PPI knew before contracting that it "never had any possessory or ownership interest in the Tools and Die Molds" and that it "never intended to transfer its interest in the Tools and Die Molds . . . within the required time period." (Zenith Sec. Am. CC ¶¶ 83–84.) PPI argues in response that it "expressly disclaimed any representation concerning title or rights in the Tools and Die Molds." (PPI MTD Br. at 17.)

The court finds neither party's arguments persuasive. The Settlement Agreement, in the first sentence of Section 1.3(a), obligates PPI to "transfer its rights to all of the machinery listed on Schedule 1.3(a)," which includes the Tools and Die Molds. (Zenith Sec. Am. CC ¶ 11.) The Settlement Agreement further states, "Zenith understands that PPI is making no representations or warranties and expressly disclaims any representation or warranty regarding title, quality, use, merchantability, fitness for a particular purpose, or any other aspect of any

piece of Machinery conveyed by PPI to Zenith." (*Id.*) But PPI's disclaimer of *title* does not necessarily disclaim its ownership of *any rights* to the Tools and Die Molds. PPI's interpretation—that their disclaimer of title also disclaimed any rights to the Machinery— cannot be correct, because it would render meaningless the contractual obligation in the first sentence of Section 1.3(a), to transfer its rights to all of the identified Machinery to Zenith. "The court must give effect to all of the language of a contract if its parts can be read together without conflict." *Fifth Third Bank, N.A. v. Int'l Bus. Machs. Corp.*, No. 3:20-cv-00035, 2021 WL 508727, at *7 (W.D. Va. Feb. 11, 2021) (quoting *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983)). Therefore, the court reads Section 1.3(a) to obligate PPI to affirmatively transfer *something* related to the Tools and Die Molds.

Additionally, even if PPI did not have any rights to the Tools and Die Molds at the time of contracting, that does not mean that it "never intended" to acquire those rights from Seves and transfer them to Zenith within the 10-day period. (Zenith Sec. Am. CC ¶ 83.) Zenith alleges that PPI's failure to mention the transfer of the Tools and Die Molds to Seves until after the 10-day period had passed "demonstrates that PPI never intended to transfer" the interests. (*Id.*) But PPI's "mere failure to perform is generally not evidence of a lack of intent to perform at the time the contract was formed." *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, No. 1:12-cv-00396, 2012 WL 3841416, at *6 (E.D. Va. Sept. 4, 2012).

In a similar vein, Zenith alleges that the omission of the Tools and Die Molds from PPI's November 2023 settlement agreement with Seves "demonstrates that PPI knew, before and after it executed the [Settlement] Agreement with Zenith, that it never had any possessory or ownership interest in the Tools and Die Molds." (Zenith Sec. Am. CC ¶¶ 52, 84.) Again,

even if PPI did not have any interest in the Tools and Die Molds at the time of contracting, it does not automatically follow that it knew or should have known that it would be unable to acquire and transfer the interest to Zenith as required by the Settlement Agreement. Zenith does not allege any facts that suggest PPI knew or should have known, *at the time of contracting*, that it would be unable to fulfill its contractual obligations as promised. In the Settlement Agreement, the Tools and Die Molds are described as "with vendor," (*id.* ¶ 18), which indicates that Zenith was at least on notice that PPI was not in possession of the Tools and Die Molds at the time of contracting and weakens any assertion of PPI's intent to mislead. Since Zenith failed to sufficiently allege that PPI made an intentional material misrepresentation, the court will grant PPI's motion to dismiss, (Dkt. 109), as to Zenith's Counterclaim 3.

### 3. Counterclaim 4 (Negligent Misrepresentation)

In Counterclaim 4, Zenith alleges negligent misrepresentation in the alternative to its fraudulent inducement claim. (Zenith Sec. Am. CC ¶¶ 88–104.) As an initial matter, negligent misrepresentation is not an independent cause of action under Virginia law. *U.S. Mining v. Nestle Purina PetCare Co.*, No. 3:24-cv-00894, 2025 WL 2646484, at *13 (E.D. Va. Sept. 15, 2025). Instead, negligent misrepresentation is generally alleged as the basis for a fraud claim. *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998). As explained above, the court already found that Zenith insufficiently alleged fraudulent inducement and thus will decline to recognize negligent misrepresentation as a separate cause of action here. *See, e.g.*, *Bay Point Condo. Ass'n v. RML Corp.*, 52 Va. Cir. 432, 443 (2000) ("The Virginia Supreme Court has not . . . recognized a separate and independent cause of action for negligent

misrepresentation and this Court declines to do so in this case."). Accordingly, the court will grant PPI's motion to dismiss, (Dkt. 109), as to Counterclaim 4.

### 4. Previously Dismissed Counterclaims 5 and 6

Zenith brings two additional counterclaims against PPI: Counterclaim 5 (Declaratory Judgment) and Counterclaim 6 (Unjust Enrichment). (Zenith Sec. Am. CC ¶¶ 105–122.) Zenith acknowledges that the court has previously dismissed these claims, and that it realleged them in order to preserve an appeal. (*See id.* at 19 n.10., 21 n.11.) For the same reasons as the court explained in its previous opinion, (*see* Dkt. 44 at 10–15), the court will grant PPI's motion to dismiss, (Dkt. 109), as to Counterclaims 5 and 6.

### 2. SouthStar's Motion to Dismiss PPI's Counterclaims (Dkt. 93)

In its counterclaims against SouthStar, PPI requests declaratory judgment on the priority of its PMSI (Counterclaim 1) and bring claims of tortious interference with contract (Counterclaim 2), common law civil conspiracy (Counterclaim 3), and statutory business conspiracy (Counterclaim 4). (PPI CC Southstar (Dkt. 106).) SouthStar filed a motion to dismiss all counterclaims, (Dkt. 93).

In Counterclaim 1 (Declaratory Judgment) against SouthStar, PPI alleges that it was granted a PMSI in the Machinery pursuant to the Settlement Agreement and perfected the PMSI by filing a UCC-1 financing statement on or about September 1, 2023. (PPI CC SouthStar ¶¶ 66–67.) Therefore, PPI wants this court to declare that its PMSI is superior to SouthStar's security interest in the Machinery. (*Id.* ¶ 75.) In response, SouthStar argues that this counterclaim is barred by Section 2.8 of the Settlement Agreement, titled "Covenant Not to Sue SouthStar." (SouthStar MTD Br. at 6 (Dkt. 94).) The section states in full: "Zenith

and PPI hereby agree not to bring or initiate any claim, suit or proceeding against SouthStar Financial, LLC directly related to this [Settlement] Agreement." (*Id.*)  SouthStar alleges that this claim is directly related to the Settlement Agreement and therefore barred by the covenant. (*Id.*)  PPI counters that Section 2.8 is void and unenforceable in Virginia as a matter of public policy, citing authority finding that courts generally refuse to "enforce provisions that purport to limit a party's liability for future intentional misconduct." (Dkt. 104 at 6; *id.* at 7 (citing *All Bus. Sols., Inc. v. NationsLine, Inc.*, 629 F. Supp. 2d 553, 560 (W.D. Va. 2009)).)  But as to Counterclaim 1 (PPI's request for declaratory judgment on its PMSI priority), PPI does not allege any intentional misconduct by SouthStar.  Rather, it focuses on the lien priority over the Machinery, which is directly related to the Settlement Agreement.  Therefore, the court does not find Section 2.8 void and unenforceable as to this counterclaim.  Accordingly, the court will dismiss PPI's Counterclaim 1.

PPI also brings Counterclaims 2 (Tortious Interference with Contract), 3 (Common Law Civil Conspiracy), and 4 (Statutory Business Conspiracy) against SouthStar.  (PPI CC SouthStar ¶¶ 76–96.)  SouthStar argues again that the covenant not to sue bars PPI from bringing these claims.  (SouthStar MTD Br. at 6.)  PPI responds that these counterclaims are not directly related to the Settlement Agreement, but that even if they were, the covenant not to sue cannot be upheld in Virginia in the face of intentional misconduct.  (Dkt. 104 at 6–8.) Regardless of whether the covenant not to sue bars PPI's claims based on SouthStar's alleged intentional misconduct, the court finds PPI failed to state a claim for both tortious interference and common law or statutory conspiracy.

Tortious interference with a contract in Virginia requires a showing of: (1) the existence of a valid contractual relationship or business expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Chipper Pro, LLC v. Bandit Indus., Inc.*, 616 F. Supp. 3d 525, 538 (W.D. Va. 2022). PPI alleges that SouthStar "intentionally interfered by inducing or causing Zenith to breach the [Settlement] Agreement including, but not limited to, by failing to make the full October 2023 payment on Zenith's behalf." (PPI CC SouthStar ¶ 79.) SouthStar claims that its non-payment cannot constitute intentional interference inducing a breach, since SouthStar was not a party to the Settlement Agreement and was not obligated under the agreement to make any payment. (SouthStar MTD Br. at 8–9.) Therefore, SouthStar avers, its "failure to pay a debt it did not owe is not tortious interference." (*Id.* at 10.)

At this stage, the court finds PPI has sufficiently pled (1) the Settlement Agreement was a valid contract, (2) SouthStar knew of the Settlement Agreement, and (3) Zenith's breach of the contract—failure to make payments according to the payment schedule—caused monetary damage to PPI. The closer question for the court is whether PPI sufficiently alleged that SouthStar *intentionally* interfered to induce Zenith's breach.

The requisite level of intent exists for a tortious interference claim if the interferer "knows that the interference is certain or substantially certain to occur as a result of [its] actions." *See Com. Funding Corp. v. Worldwide Sec. Sevs. Corp.*, 249 F.3d 204, 212–13 (4th Cir. 2001) (quoting Restatement (Second) of Torts § 766 cmt. j.) While PPI alleges an agreement

between Zenith and SouthStar—for SouthStar to pay PPI on Zenith's behalf, (*see* PPI CC SouthStar ¶ 25)—PPI does not allege that SouthStar knew Zenith would not be able to secure financing for the payments it owed PPI without Southstar's help.  Nor does PPI allege any facts suggesting that SouthStar withheld financing for the purpose of causing or inducing Zenith to breach the Settlement Agreement with PPI.  Accordingly, the court finds PPI failed to sufficiently state a claim of tortious interference against SouthStar and will dismiss PPI's Counterclaim 2.

PPI next alleges common law civil conspiracy (Counterclaim 3) and statutory business conspiracy (Counterclaim 4) against SouthStar.  (PPI CC SouthStar ¶¶ 81–96.)  PPI contends that SouthStar and Zenith agreed to "accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means," including SouthStar's tortious interference with the Settlement Agreement.  (*Id.* ¶ 84.)  As the court explains above, PPI does not sufficiently state a claim of tortious interference against SouthStar.  That is, PPI does not sufficiently allege *whether and how* Southstar and Zenith together engaged in some type of misconduct.  Without sufficiently alleging an underlying unlawful or bad act, PPI's common law and statutory conspiracy claims must both fail.  *See Aimbridge Hosp., LLC v. Provident Grp.-Radford Props., LLC*, No. 7:24-cv-00262, 2024 WL 3534150, at *8–9 ("Because Virginia civil conspiracy claims— business and common law—require a wrongful or unlawful underlying act, a necessary component of pleading a civil conspiracy claim is adequately pleading the underlying act."); *see also Com. Bus. Sys., Inc. v. Halifax Corp.,* 484 S.E.2d 892, 896 (Va. 1997) ("[W]ithout proof of the underlying tort, there can be no conspiracy to commit the tort").  Since the rest of PPI's conspiracy claims are based on Critzer's, not SouthStar's conduct, the court will dismiss PPI's

Counterclaims 3 and 4.  Accordingly, the court will grant SouthStar's motion to dismiss, (Dkt. 93).

### 3.  Critzer's Partial Motion to Dismiss PPI's Counterclaims (Dkt. 121)

In its counterclaims against Critzer, PPI alleges declaratory judgment (Counterclaim 1), fraudulent conveyance (Counterclaim 2), and tortious interference with business expectancy (Counterclaim 3).  Critzer moves to dismiss PPI's Counterclaims 2 and 3.[8]

In Counterclaim 2 (Fraudulent Conveyance), PPI alleges that Critzer entered into the Real Estate Transaction[9] on December 15, 2023 "with intent to delay or hinder" PPI in violation of the Virginia Fraudulent Conveyance statute.  (PPI CC Critzer at 21–23 (Dkt. 101).)  That statute states, in relevant part:

> Every (i) gift, conveyance, assignment, or transfer of, or charge upon, any estate, real or personal . . . and (iii) bond or other writing given with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers, or other persons or their representatives or assigns, be void.

Va. Code Ann. § 55.1-400.  PPI argues that it is entitled to relief as an "other person" under the statute, while Critzer contends that PPI is not covered by this statute because (1) PPI is not a creditor of Kaya Properties, the grantor, and (2) PPI does not have a security interest in the real estate at issue.  (*See* Dkt. 126 at 2; Dkt. 122 at 5–10.)

The court finds Critzer's argument more persuasive.  PPI is neither a "creditor" nor an "other person" contemplated by the language of this statute.  As stated above, Va. Code § 55.1-400 applies to transfers or conveyances made by a transferor/grantor of real or personal

---

[8] In Counterclaim 1 (Declaratory Judgment) against Critzer, PPI asks the court to enter declaratory judgment in its favor and find that its PMSI is superior to Critzer's.  (PPI CC Critzer at 19–21.)  Critzer does not move to dismiss this counterclaim.

[9] See subsection I.A.6 for a description of the Real Estate Transaction.

property, with the intent to delay, hinder, or defraud "creditors, purchasers, or other persons," who have lawful entitlement to that property.  Va. Code Ann. § 55.1-400.

Va. Code § 55.1-412 defines the term "creditor."  While the term "creditor" is not "restricted to . . . creditors of . . . the grantor," it covers those "who, but for the deed or writing, would have had title to the property conveyed or a right to subject it to their debts." Va. Code § 55.1-412.  In its counterclaim, PPI does not allege that it is a creditor of Kaya Properties, nor does it allege that it is an "other person" who is lawfully entitled to or hold any security interest in the transferred real property.  The argument that Kaya Properties is an alter ego of Zenith or that PPI is a subsequent creditor of the "Zenith Entities," (Dkt. 126 at 7–10), is also unavailing because PPI has not sufficiently alleged *how* it is (1) a subsequent creditor of Kaya Properties, (2) a third party who has any interest in the subject real property, or (3) a third party with the ability to subject that real property to its debt, if the Real Estate Transaction had not been executed.  *See id.*  Based on this failure, the court will dismiss Counterclaim 2.

In Counterclaim 3 (Tortious Interference), PPI alleges that Critzer tortiously interfered with a business expectancy by entering into the Real Estate Transaction.  (PPI CC Critzer at 23–24.)  To plead a claim for tortious interference with a business expectancy, PPI must allege: (1) the existence of a business expectancy, with a probability of future economic benefit to PPI; (2) Critzer's knowledge of the expectancy; (3) a reasonable certainty that absent Critzer's intentional misconduct, PPI would have realized the expectancy; and (4) damage to PPI.  *East West, LLC v. Rahman*, 873 F. Supp. 2d 721, 734 (E.D. Va. 2012).

PPI alleges that it had a "business expectancy and probability of future economic benefit" because "Zenith was to pay PPI $7 million under the [Settlement] Agreement, and Zenith's payment was secured by PPI's PMSI." (PPI CC Critzer at 23.) It claims that Critzer knew of this expectancy, since SouthStar and Critzer share principals, including Bernard and Susan Linney, and SouthStar knew of PPI's PMSI. (*Id.* at 24.) PPI argues Critzer "prevent[ed] PPI's foreclosure on and sale of the Collateral" by entering into the Real Estate Transaction and asserting "landlord lien rights" over the Collateral. (*Id.*)

But PPI failed to allege a reasonable certainty that absent Critzer's alleged intentional misconduct—entering into the Real Estate Transaction and asserting "landlord lien rights"—PPI would have realized the expectancy by successfully foreclosing on and selling the Collateral. In support of this element, PPI merely states: "Absent Critzer's interference, PPI would have been able to realize its business expectancy. (*See generally* ECF No. 90.)." (*See id.*) "ECF No. 90" is a citation to the court's memorandum opinion granting in part and denying in part PPI's prior motion to dismiss Critzer's initial counterclaims. (*See* Dkt. 90.) Nowhere in that opinion did the court find that PPI would have been able to successfully foreclose on the Collateral if the Real Estate Transaction had never occurred. Nor does it find that here. PPI does not allege any new facts, or any facts at all, to support this element of its tortious interference claim. PPI's "formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545. The court will therefore dismiss PPI's Counterclaim 3. Accordingly, the Court will grant Critzer's motion to dismiss PPI's Counterclaims, (Dkt. 121).

## IV. Conclusion

For the reasons stated above the court will **DENY** Zenith's motion to dismiss PPI's second amended complaint, (Dkt. 113), **GRANT** in part and **DENY** in part PPI's motion to dismiss Zenith's second amended counterclaims,[10] (Dkt. 109), **GRANT** Southstar's motion to dismiss PPI's counterclaims, (Dkt. 93), and **GRANT** Critzer's motion to dismiss PPI's counterclaims, (Dkt. 121).

An appropriate Order will issue.

**ENTERED** this <u>18th</u> day of December, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE

---

[10] The court will deny PPI's motion to dismiss Zenith's second amended counterclaims, (Dkt, 109), as to Paragraphs 57(b) and (d) of Counterclaim 1 and grant the motion as to Paragraphs 57(c), (f) and (g) of Counterclaim 1, along with Counterclaims 2 through 6.